UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| MIRNA REYES, ET AL., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CIVIL ACTION NO. |
| VS. | ) | |
| | ) | 3:10-CV-0868-G |
| NORTH TEXAS TOLLWAY | ) | |
| AUTHORITY (NTTA), | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the court are the defendant's motion for summary judgment (docket
entry 145) and the plaintiffs' motion for partial summary judgment and declaratory
relief (docket entry 140).  For the reasons stated below, the defendant's motion is
granted, and the plaintiffs' motion is denied.

### I.  BACKGROUND

#### A.  Factual Background

There are no disputed material facts.  In 2010, the plaintiffs, through their
class representatives, including named plaintiff Mirna Reyes, filed suit asserting
several claims against the defendant North Texas Tollway Authority ("NTTA").  *See*

Plaintiffs' Original Complaint (docket entry 1-5).  After roughly six years of litigation, all of the plaintiffs' remaining claims against NTTA arise from their complaint that NTTA charged excessive administrative fees to users of NTTA's toll roads who failed or refused to pay their tolls.  Plaintiffs' Fourth Amended Complaint ("Fourth Am. Complaint") ¶¶ 37-38, 53-72 (docket entry 114).

In 1997, the Texas legislature authorized the establishment of NTTA via the Regional Tollway Authority Act, TEX. TRANS. CODE § 366.001-366.409 (1997).  Fourth Am. Complaint ¶ 14; Defendant's Answer to Plaintiffs' Fourth Amended Complaint ("Answer") ¶ 14 (docket entry 115).  When NTTA was established, drivers paid tolls in one of two ways: by paying cash at a toll both, or by using a TollTag.  NTTA's Motion for Summary Judgment Appendix ("NTTA's MSJ App.") at 004 (docket entry 147).  A TollTag is a transponder that drivers can obtain from NTTA and affix to their vehicle's windshield.  *Id.*  The TollTag is linked to a payment account and the appropriate toll is deducted from the account each time the TollTag passes through a collection point.  *Id.*  No matter the payment method, however, all customers had to pass through gated toll booths.  *Id.*  A driver could only pass through a tolling point without paying by breaking through the gate or by "tailgating" and passing under the gate as it opened for the vehicle immediately in front of her.  *Id.*  As a result of the physical obstacles to nonpayment, only a small percentage of customers failed to pay.  *Id.*  If a driver tailgated another driver by sneaking through

gate or broke through a gate, the driver would be charged an immediate $10 per-transaction administrative fee plus the driver's unpaid toll.  *Id.* at 004-05.  In addition, NTTA's only method of collecting unpaid tolls relied on a toll collector seeing the violation and writing down the vehicle's license plate number.  *Id.* at 672-73.

In 2000, NTTA opened TollTag-Only lanes and stopped manning all toll booths on a 24-hour, 7 day-a-week basis.  *Id.* at 005, 228, 659-61, 679-81.  When it began the process of opening TollTag-Only lanes, NTTA contends that it determined that "the $10 administrative fee [was] not adequate to cover administrative costs" it incurred in collecting unpaid tolls.  *Id.* at 005, 228.  NTTA anticipated increased costs in collecting unpaid tolls through its purchase and installation of cameras, *id.* at 661, expansion of a back-office system to accommodate the collection process, *id.,* and an increase in the number of customers who would fail or refuse to pay, which would drive up the cost of identifying, pursuing, and collecting unpaid tolls.  *Id.* at 005, 239, 661, 680-81.  After looking into the issue, NTTA determined that increasing the administrative fee to $25 would be a reasonable increase sufficient to cover the anticipated cost increases.[1]  *Id.* at 005, 670-71.

---

[1]        The plaintiffs contend that the $25 per-transaction charge was set without debate, consideration or projections regarding costs or collection rates, citing NTTA board of directors' meeting where the board voted in favor of the fee without discussion at the particular meeting during which the fee was established.  Plaintiffs' Brief in Support of Their Motion for Partial Summary Judgment and Declaratory

(continued...)

At all times relevant to this litigation -- March 31, 2008 to August 31, 2011 -- drivers on NTTA roads had three payment options:  a toll booth for cash and coins,[2] a TollTag account, and the ZipCash system.  From 2007 to 2010, NTTA gradually converted to an all-electronic toll collection ("ETC") process on its roadways, replacing manned tollbooths with a form of cashless tolling called ZipCash.  *Id.* at 006-07.  In the ZipCash system, cameras at collection points captured an image of a vehicle's license plate as the vehicle passed through a collection point.  *Id.* at 006-07, 699 (drive first, pay later).  NTTA matched the images of the license plate with the registered vehicle owner in the Texas Department of Motor Vehicle database. Plaintiffs' MPSJ App. at 121.  After a vehicle travelled through an NTTA collection point a sufficient number of times, NTTA printed and mailed a ZipCash invoice to the vehicle's registered owner.  *Id.* at 159-60.  The ZipCash system functioned as a faster alternative to cash toll booths, *id.*, enabled more drivers to travel the roadways without toll lines, *id.*, and served as a backstop for the TollTag system.  *Id.* at 103-04.

_____

[1](...continued)
Relief ("Plaintiffs' MPSJ Brief") at 12 (docket entry 148) (citing Plaintiffs' Appendix Attached in Support of Their Motion for Partial Summary Judgment and Declaratory Relief ("Plaintiffs' MPSJ App.") at 240-41 (docket entry 149).

[2]      "During the pendency of the relevant time period, cash pay toll booths were phased out of NTTA system in favor of all-electronic toll collection or cashless tolling.  This class action does not include those individuals who paid tolls in cash at toll booths."  Fourth Am. Complaint ¶ 15 n.4; Answer ¶ 15 n.4.

NTTA charged a 50% higher rate for ZipCash tolls -- called the ZipCash premium --

than the TollTag rate.  *Id.* at 006-07, 121.

During the relevant time period, a ZipCash customer had 30 days, plus a 5 day

grace period, to pay the ZipCash invoice without incurring any additional fees.

NTTA's MSJ App. at 007.  If the customer failed or refused to pay the ZipCash

invoice within 35 days, NTTA sent the customer a Late Notice, which required

payment of the unpaid tolls, plus a per invoice $1.50[3] Late Notice[4] fee.  *Id.*  The Late

Notice gave the customer 15 days from the date on the Late Notice to pay the unpaid

tolls and the $1.50 or $2.50 Late Notice fee.  *Id.*

If a customer failed or refused to pay the Late Notice invoice within 15 days,

NTTA sent the customer a Violation Invoice requiring payment of the unpaid tolls

and an administrative fee of $25 for each unpaid toll -- the fee at issue here -- within

30 days.[5]  *Id.* at 007, 775-76.

NTTA offered customers alternatives to paying the full amount of the

administrative fee.  For example, if the driver paid the unpaid tolls on the Violation

---

[3]     In late 2008, NTTA increased the Late Notice administrative fee to
$2.50 per Late Notice invoice.  NTTA's MSJ App. at 007.

[4]     NTTA defines this fee as the administrative fee assessed in the Late
Notice.  NTTA's MSJ App. at 007.  The plaintiffs define this fee as the Late Notice
fee.  Plaintiffs' MPSJ Brief at 21 n.23.  For clarity and consistency, the court will refer
to this fee as the Late Notice fee.

[5]     NTTA did not charge the customer for the $1.50 or $2.50 Late Notice
fee on the Violation Invoice.  *Id.*

Invoice by the due date, NTTA would reduce her administrative fees by up to 67% to $8.33 per unpaid toll. *Id.* at 008, 775-76. Under another payment alternative, NTTA reduced the administrative fees charged on the Violation by up to 67% to $8.33 per unpaid toll, if the customer opened a TollTag account and paid all unpaid tolls. *Id.* Under the TollTag option, during certain promotional periods, NTTA would excuse 100% of the administrative fees if the customer paid all unpaid tolls and agreed to open a TollTag account. *Id.* If the customer failed or refused to pay the Violation Invoice by the due date, NTTA sent the customer's outstanding balance to a third-party collection agency, which attempted to collect the debt for 180 days. *Id.* at 007-08. If the collection agency was unsuccessful, NTTA forwarded the customer's account to the Texas Department of Public Safety for issuance of a criminal citation. *Id.* at 008.

The facts pertaining to the named plaintiffs illustrate how the administrative fees escalated if the customer failed or refused to pay the unpaid tolls. The plaintiff Jennifer Bunch was charged $350.00 in administrative fees on $19.58 in unpaid tolls. Plaintiffs' MPSJ App. at 211. Among other fees at other times, the plaintiff Deborah Gilbert was charged $125.00 in administrative fees on a single invoice. *Id.* at 306. The plaintiff Mirna Reyes was charged at least $3,700.00 in administrative fees on

$135.50 in unpaid tolls.  *Id.* at 212-20.  The plaintiff Emmanuel Lewis was charged $10,050.00 in administrative fees on $387.50 in unpaid tolls.[6]  *Id.* at 222-35.

At all times during the relevant time period, NTTA's Customer Service Center ("CSC") representatives were available by phone or in person to speak with customers to resolve unpaid tolls and administrative fees, answer questions, and were empowered with discretion and authority to reduce or excuse administrative fees based on the customer's individual circumstances.  NTTA's MSJ App. at 008.  As NTTA transitioned to all-ETC, the number of customers who used NTTA's roadways and the number of customers who used the cashless system increased dramatically. *Id.* at 009.  As ZipCash customers increased in number, so too did customers who incurred administrative fees.  *Id.*  As the number of customers who incurred administrative fees increased, so too did customer complaints within the Dallas-Fort Worth area.  *Id.*; Plaintiffs' Appendix Attached in Support of Their Opposition to NTTA's Motion for Summary Judgment ("Plaintiffs' Opp. App.") at 129-58 (docket entry 166).

In response to the complaints NTTA received and the complaints broadcast through local news, NTTA re-examined whether the administrative fee was set at an

---

[6]    However, the facts pertaining to how NTTA reduced fees and negotiated reasonable outcomes with the named plaintiffs illustrate NTTA's reasonable management of the administrative fee scheme.  *See* NTTA's Brief in Opposition to Plaintiffs' Motion for Partial Summary Judgment and Declaratory Relief ("NTTA's Opp. Brief") at 20-23 (docket entry 160).

appropriate level.  NTTA's MSJ App. at 009; Plaintiffs' Opp. App. at 129-58.  NTTA

compared its administrative fees to those of other toll agencies, NTTA's MSJ App. at

605, 688-91, listened to customers to understand their frustration, *id.* at 605, and

compared its administrative fees to its costs of collecting unpaid tolls.  *Id.* at 360-61,

559-61, 609-13.  NTTA compared its fees and costs using data generated from an

activity-based cost model prepared by Pat Louthan, a contractor engaged by NTTA to

model NTTA's costs.  *Id.* at 359-61, 483-87, 557, 559-61, 682-84.  Using expense

data collected from NTTA's general ledger, Louthan allocated all of NTTA's direct

and indirect costs into various activities performed by NTTA, including all of the

various activities that go into the collection of unpaid tolls.  *Id.* at 611, 682-84.

Focusing on only the activities taking place from the Late Notice stage onward,

NTTA compared exactly how much was spent to collect unpaid tolls with the amount

of administrative fees NTTA collected.  *Id.* at 369-70, 483-87, 559-61, 611-13.

Louthan calculated, using data from 2007, that the total average cost of collection for

an unpaid toll -- from tracking the vehicle through the collection agency stage -- was

$0.94.  Plaintiffs' Opp. App. at 328.

In March 2010, after reviewing the results from all of its research regarding the

administrative fee, NTTA determined that the administrative fees it charged did "not

generate excess revenue beyond that necessary to recover the cost of collecting tolls

and violations."  NTTA's MSJ App. at 559.  NTTA staff presented its findings to the

finance and audit committee of NTTA's board of directors on December 7, 2009, January 11, 2010, and February 4, 2010, before making a final presentation to the full board of directors on March 24, 2010. *Id.* at 232, 242-70, 355, 362-77, 435, 442-72, 548-49, 562-97. Based on its findings, NTTA staff recommended that the board formally adopt the policy that had been informally implemented by staff in September 2009, which was to reduce the administrative fee to $8.33 per unpaid toll if the customer paid a Violation Invoice within 30 days of the date on the invoice. *Id.* at 561, 576, 647. The board voted 8-1 to adopt the staff's recommendation. *Id.* at 229-30.

After this suit was filed, NTTA engaged Steven E. Turner, a senior managing director at FTI Consulting, Inc., to evaluate NTTA's costs of collecting unpaid tolls and NTTA's administrative fees collected. *Id.* at 011. Turner concluded that NTTA spent $10,336,757 more in collecting unpaid tolls than it collected in administrative fees -- NTTA collected $41,677,514 in administrative fees assessed for unpaid tolls during the time period March 31, 2008 through August 31, 2011, but NTTA spent $52,014,271 collecting unpaid tolls.[7] *Id.* at 012.

---

[7]     Using the cost per transaction calculation of the plaintiffs' expert, Scott D. Hakala, to determine NTTA's total cost, NTTA's cost of collection was $54,133,019, exceeding NTTA's collected administrative fees by approximately $12.4 million. NTTA's MSJ App. at 012-13. Since the defendants use a lower collection cost, the court will refer to the defendants' collection cost calculation.

While NTTA focuses its analysis on the costs it incurred versus the administrative fees NTTA *received*, the plaintiffs highlight the total amount of administrative fees NTTA *charged* the class members compared to NTTA's incurred costs.  During the relevant time period, NTTA charged roughly $1.38 billion in administrative fees.  Plaintiffs' MPSJ Brief at 1 (citing Plaintiffs' MPSJ App. at 061-62); NTTA's MSJ App. at 079.  As cited in the previous paragraph, NTTA has collected $41,677,514 of the $1.38 billion charged, and has spent $52,014,271 trying to collect the underlying unpaid tolls.  NTTA's MSJ App. at 012.  NTTA has collected a mere 1/26th of the amount charged because it waived roughly $499 million worth of administrative fees on 21,104,015 toll transactions, and is still owed roughly $472 million in administrative fees it has not been able to collect.  Plaintiffs' MPSJ App. at 087-94, 125.  Further, the plaintiffs highlight the fact that NTTA charged the $25 administrative fee while it cost NTTA on average roughly $0.93 to collect an unpaid toll.[8]  *Id.* at 308-21; Plaintiffs' MPSJ Brief at 20-21 n.22.

## B.  Procedural Background

The plaintiffs originally filed this suit in the 191st Judicial District Court of Dallas County, Texas on March 31, 2010.  *See* Defendants' Notice of Removal at 1-2 (docket entry 1).  The defendant removed the case to this court on April 30, 2010 on

---

[8]  The parties disagree over the proper cost of collection model, but either way the collection costs are less than $1.00 and the differences do not affect this court's analysis.

the grounds that the case presents a federal question.  *Id.* at 2.  On November 14, 2011, the court dismissed the plaintiffs' claims against six individual defendants and also dismissed all of the claims against NTTA except for the plaintiffs' federal constitutional claim under the Due Process Clause of the Fourteenth Amendment.  *See* Memorandum Opinion and Order of November 14, 2011 at 31-32 (docket entry 31).

The court granted NTTA leave to move for summary judgment on two threshold legal issues.  *See* Order of November 5, 2013 (docket entry 68).  NTTA's motion for summary judgment on threshold legal issues listed the threshold legal issues as:  "(1) [d]id the former version of Section 366.178[9] of the Transportation Code require a correlation between the administrative fee charged by NTTA and 'the cost of collecting the unpaid toll?'"; and (2)"[i]f Section 366.178 required a correlation, did a lack of correlation constitute a violation of due process?"  NTTA's Motion for Summary Judgment on Threshold Legal Issues (docket entry 76).

On June 12, 2014 the court granted NTTA's motion for summary judgment on the plaintiffs' procedural due process claim.  *Reyes*, 2014 WL 2616841, at *13.  The court denied NTTA's motion for summary judgment on NTTA's reading of the pre-amendment Texas Transportation Code § 366.178.  *Id.*  The court concluded that

---

[9]     The Texas legislature amended § 366.178 on May 27, 2011.  SB 469, Act of May 27, 2011, 82d Leg., R.S., ch. 1216, §§ 1-4, 2011 TEX. SESS. LAW SERV. 3247-49 (Vernon) (to be codified at TEX. TRANSP. CODE § 366.003.178).  The court applies the pre-amendment section 366.178(c) to this suit.  See generally *Reyes v. North Texas Tollway Authority*, No. 3:10-CV-0868-G, 2014 WL 2616841, at *2 (N.D. Tex. June 12, 2014) (Fish, J.).

section 366.178 is not ambiguous and that its plain meaning requires a correlation
between the administrative fee and the cost of collecting an unpaid toll. *Id.* at *6.
Lastly, the court denied NTTA's motion for summary judgment on the plaintiffs'
substantive due process claim. *Id.* at *13. The court concluded that more factual
development was necessary to determine whether NTTA's actions in setting and
imposing the administrative fee were rationally related to a legitimate government
interest. *Id.* at *10.

The plaintiffs then filed a motion for partial summary judgment and
declaratory relief (docket entry 140). In it, the plaintiffs requested that the court
grant them partial summary judgment under FED. R. CIV. P. 56 on the issue of
NTTA's liability for substantive due process violations and that the court grant them
declaratory relief under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, and
FED. R. CIV. P. 57 as follows: (1) "[a] judicial declaration that the version of Texas
Transportation Code [s]ection 366.178 in effect during the time period between
March 31, 2008 and August 31, 2011, only permitted NTTA to charge an
administrative fee that was correlated to its costs of collecting an unpaid toll;" (2) "[a]
judicial declaration that the $1,382,533,725 in administrative fees assessed by NTTA
against the [p]laintiffs and others during the time period between March 31, 2008,
and August 31, 2011, impermissibly exceeded NTTA's costs of collecting unpaid
tolls;" and (3) "[a] judicial declaration that NTTA's imposition of these

administrative fees violated [p]laintiffs' due process rights, as guaranteed by the Fourteenth Amendment to the Constitution of the United States of America." Plaintiffs' Motion for Partial Summary Judgment and Declaratory Relief at 2-3 (docket entry 140).  NTTA filed a timely response to the plaintiffs' motion for partial summary judgment and declaratory relief (docket entry 159),[10] to which the plaintiffs served a timely reply (docket entry 171).

NTTA has also filed a motion for summary judgment on all claims asserted by the plaintiffs (docket entry 145).  In it, NTTA requests that the court conclude that the plaintiffs' declaratory judgment claim based on TEX. TRANSP. CODE § 366.178(c) fails as a matter of law, that the plaintiffs' substantive due process claim asserted under the Fourteenth Amendment fails as a matter of law, and that the plaintiffs cannot seek injunctive relief because they have no viable claims.  NTTA's Brief in Support of its Motion for Summary Judgment ("NTTA's MSJ Brief") at i (docket entry 146).  The plaintiffs filed a timely response to NTTA's motion for summary

---

[10]      NTTA's contention that the court cannot grant the plaintiffs' motion for partial summary judgment because the plaintiffs' failed to address its affirmative defenses, listed in its pleadings, is denied as moot because in this order the court denies the plaintiffs' motion for partial summary judgment.  The court, however, references NTTA's argument simply to dismiss it because NTTA's contention is an incorrect statement of the law.  See *Bank of Louisiana v. Aetna U.S. Healthcare Inc.*, 468 F.3d 237, 241 (5th Cir. 2006), *cert. denied*, 549 U.S. 1281 (2007); *CSX Transportation, Inc. v. Auburn Thirty Six, LLC*, No. 4:12-CV-1984-JAR, 2014 WL 2480610, at *3 (E.D. Mo. June 3, 2014).

judgment (docket entry 164), to which NTTA served a timely reply (docket entry

173).  Both motions are now ripe for consideration.

## II.  ANALYSIS

### A.  Evidentiary Objections

Before considering the merits of the parties' motions, the court must address

NTTA's objections to and motion to strike (docket entry 156) plaintiffs' proffered

summary judgment evidence ("NTTA's MPSJ Motion to Strike"), NTTA's motion to

exclude (docket entry 157) the expert testimony of Scott D. Hakala ("NTTA's

Motion to Exclude"), NTTA's objections to and motion to strike (docket entry 174)

evidence attached in support of the plaintiffs' opposition to NTTA's motion for

summary judgment ("NTTA's Motion to Strike Plaintiffs' Opp. App."), and NTTA's

motion to strike (docket entry 187) the appendix to plaintiffs' summary judgment

reply brief ("NTTA's Motion to Strike Plaintiffs' Reply App.").  The court will

consider only the evidentiary objections specifically raised by NTTA.  See *Eguia v.*

*Tompkins*, 756 F.2d 1130, 1136 (5th Cir. 1985) ("Documents presented in support of

a motion for summary judgment may be considered even though they do not comply

with the requirements of Rule 56 if there is no objection to their use.").

First, NTTA objects to the plaintiffs' proffered expert report and supplemental

reports of Dr. Scott D. Hakala.  *See* NTTA's MPSJ Motion to Strike at 2-6; NTTA's

Motion to Strike Plaintiffs' Opp. App. at 2-7; NTTA's Motion to Exclude at 7-20.

NTTA contends that the plaintiffs' expert evidence is inadmissible because Hakala is

not qualified, his damages calculations are unreliable, and his reports and summaries

are irrelevant and prejudicial.  NTTA's Motion to Exclude at 7-20 (relying on FED. R.

EVID. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597

(1993)).  The court concludes that Hakala is qualified as an expert to opine on

relevant issues before the court.  *See* Plaintiffs' MPSJ App. 001-02, 028-052.  The

court further concludes that Hakala's techniques and calculations, while not

immaculate, satisfy the reliability requirement.  *Daubert*, 509 U.S. at 594.  Finally,

the court concludes that Hakala's expert testimony is relevant and non-prejudicial.

NTTA successfully attacks the weight of the expert evidence, see *Primrose Operating

Company v. National American Insurance Company*, 382 F.3d 546, 562 (5th Cir. 2004),

but the court concludes that Hakala's expert opinions satisfy FED. R. EVID. 702

admissibility standards.  NTTA's motion to exclude (docket entry 157) the expert

testimony of Hakala is denied.

Next, NTTA objects to the plaintiffs' evidence of statements made by several

individuals -- some NTTA board members.  NTTA's MPSJ Motion to Strike at 7-9.

NTTA contends that the plaintiffs attached this evidence "to purportedly

demonstrate an act done, a decision made, or a statement made or adopted by

NTTA's [b]oard of [d]irectors."  *Id.* at 7.  The court agrees with NTTA that the board

of directors "can express themselves and represent [NTTA] only by acting in concert

in a meeting duly organized." *Austin Neighborhoods Council, Inc. v. Board of Adjustment of the City of Austin, Texas*, 644 S.W.2d 560, 564 & n.14 (Tex. App.--Austin 1982, writ ref'd n.r.e.) (citing multiple cases).  However, the plaintiffs -- aside from one instance, *see* NTTA's MPSJ Motion to Strike at 9 -- do not attempt to impute these statements to NTTA.  NTTA's arguments go to the weight of the evidence, not its admissibility or relevance.  Lastly, the parties have stipulated that the documents in which the statements appear satisfy the requirements of the business records exception to the hearsay rule, FED. R. EVID. 803(6), and are therefore admissible.

NTTA also objects to the plaintiffs' evidence of Texas State Senator Jane Nelson's statements, cited in support of their conclusion of the purported exorbitance of assessed administrative fees, as irrelevant and hearsay.  *Id.*  Senator Nelson's statements are hearsay, but fall under the "state of mind" exception to the hearsay rule, FED. R. EVID. 803(3), because they "show her state of mind at the time she spoke them, and demonstrate her motive and intent in proposing legislation to curb the NTTA's administrative fee practices."  Plaintiffs' Response to NTTA's Opposed Objections ("Plaintiffs' Obj. Response") at 17 (docket entry 179).  Further, the statements, already in the record, are relevant under FED. R. EVID. 401(a).

NTTA objects to the plaintiffs' evidence of news articles as inadmissible hearsay and irrelevant.  NTTA's Motion to Strike Plaintiffs' Opp. App. at 6-7 (citing *Roberts v. City of Shreveport*, 397 F.3d 287, 295 (5th Cir. 2005) ("The plaintiffs

provide only newspaper articles -- classic, inadmissible hearsay.").  The plaintiffs did

not attach the articles to prove the truth of the matter asserted in them.  The

plaintiffs offered the articles to prove only that the statements were made about

NTTA's administrative fee scheme.  FED. R. EVID. 801(c)(2); see also *Jauch v. Corley*,

830 F.2d 47, 52 (5th Cir. 1987).  The statements are relevant and admissible.

Lastly, NTTA moved to strike the appendix the plaintiffs filed in support of

their motion for summary judgment reply brief.  NTTA's Motion to Strike Plaintiffs'

Reply App. at 1.  A summary judgment movant cannot introduce new evidence in a

reply brief without first seeking leave of court.  In the plaintiffs' response to NTTA's

motion to strike the appendix to plaintiffs' summary judgment reply (docket entry

192), the plaintiffs request leave if the court should determine that they should have

requested leave before filing their reply appendix.  While this strikes the court as a

"better to ask for forgiveness than permission" approach that diminishes the rules of

the court and is not the proper procedure for requesting leave of court, the evidence

in the appendix attached in support of the plaintiffs' summary judgment does not

alter the resolution of the plaintiffs' partial motion for summary nor the defendant's

motion for summary judgment.  Therefore, NTTA's motion to strike (docket entry

187) the appendix the plaintiffs filed in support of their motion for summary

judgment reply brief is denied.

NTTA's objections to the plaintiffs' evidence are overruled.  Therefore,

NTTA's MPSJ Motion to Strike (docket entry 156), NTTA's Motion to Exclude

(docket entry 157), NTTA's Motion to Strike Plaintiffs' Opp. App. (docket entry

174), and NTTA's Motion to Strike Plaintiffs' Reply App. (docket entry 187) are

denied.

## B.  Summary Judgment Standard

Summary judgment is proper when the pleadings, depositions, admissions,

disclosure materials on file, and affidavits, if any, "show[] that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of

law." FED. R. CIV. P. 56(a), (c)(1).  A fact is material if the governing substantive law

identifies it as having the potential to affect the outcome of the suit.  *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue as to a material fact is

genuine "if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party."  *Id.*; see also *Bazan ex rel. Bazan v. Hidalgo County*, 246 F.3d 481,

489 (5th Cir. 2001) ("An issue is '*genuine*' if it is real and substantial, as opposed to

merely formal, pretended, or a sham.").  To demonstrate a genuine issue as to the

material facts, the nonmoving party "must do more than simply show that there is

some metaphysical doubt as to the material facts."  *Matsushita Electric Industrial*

*Company v. Zenith Radio Corporation*, 475 U.S. 574, 586 (1986).  The nonmoving

party must show that the evidence is sufficient to support the resolution of the

material factual issues in his favor.  *Anderson*, 477 U.S. at 249 (citing *First National Bank of Arizona v. Cities Service Company*, 391 U.S. 253, 288-89 (1968)).

When evaluating a motion for summary judgment, the court views the evidence in the light most favorable to the nonmoving party.  *Id.* at 255 (citing *Adickes v. S.H. Kress & Company*, 398 U.S. 144, 158-59 (1970)).  However, it is not incumbent upon the court to comb the record in search of evidence that creates a genuine issue as to a material fact.  See *Malacara v. Garber,* 353 F.3d 393, 405 (5th Cir. 2003).  The nonmoving party has a duty to designate the evidence in the record that establishes the existence of genuine issues as to the material facts.  *Celotex Corporation v. Catrett*, 477 U.S. 317, 324 (1986).  "When evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court."  *Malacara*, 353 F.3d at 405.

## C.  Section 366.178(c)

### 1.  *Prior Opinion*

As stated above, the court denied NTTA's motion for summary judgment on threshold issues as to NTTA's reading of the pre-amendment Texas Transportation Code § 366.178.  *Reyes,* 2014 WL 2616841, at *6.  At all times relevant to this case, section 366.178(b)-(c) read as follows:

> (b) A person who fails or refuses to pay a toll provided for
> the use of a project is liable for a fine not to exceed $250,

- 19 -

> plus an administrative fee incurred in connection with the violation.
>
> (c) If a person fails to pay the proper toll:
>
>> (1) on issuance of a notice of nonpayment, the registered owner of the nonpaying vehicle shall pay both the proper toll and the administrative fee; and
>>
>> (2) an authority may charge an administrative fee of not more than $100 to recover the cost of collecting the unpaid toll.

TEX. TRANSP. CODE § 366.178(b)-(c) (pre-amendment). The plaintiffs insisted that the statute required a correlation between the administrative fees charged under section 366.178(c)(2) and "the cost of collecting the unpaid toll." *Reyes*, 2014 WL 2616841, at *4. NTTA contended that the statute did not require a correlation. *Id.*

The court concluded that section 366.178 was not ambiguous and that its plain meaning required a correlation between the administrative fee and the cost of collecting an unpaid toll. *Id.* at *6. The court concluded that the phrase "'to recover the cost of collecting the unpaid toll' quite clearly imposes a limitation on the administrative fee," *id.*, and that if correlation to the costs were not required, the administrative fee would be "indistinguishable from the fine" permitted in 366.178(b). *Id.* at *5.

### 2.  *The Parties' Arguments*

Here, the plaintiffs contend that NTTA's charging of $1.38 billion of administrative fees, which is 26 times the costs of collecting unpaid tolls, violated section 366.178(c) because NTTA failed to correlate the administrative fees to the costs of collecting the unpaid tolls.  Plaintiffs' MPSJ Brief at 1.  The plaintiffs insist that NTTA was required to correlate the administrative fee with the amount it cost NTTA to collect an unpaid toll under section 366.178(c).  *Id.* at 20, 25, 30.  Conversely, NTTA contends that it complied with section 366.178(c) comparing the costs it incurred in collecting unpaid tolls with the administrative fees it actually received.  NTTA's Opp. Brief at 28-34; NTTA's Reply Brief in Support of NTTA's Motion for Summary Judgment ("NTTA's Reply") at 5 (docket entry 173).  Therefore, the parties' disagreement is whether section 366.178(c) required NTTA to correlate the amount of the administrative fee with the average cost it incurred in collecting unpaid tolls or whether it permitted NTTA to set the amount of the administrative fee at a level that correlated with its aggregate collection costs.

### 3.  *Section 366.178(c) Does Not Create A Private Cause of Action*

The plaintiffs devote significant space in their briefs to contend that NTTA violated section 366.178(c).  Further, the plaintiffs seek a declaratory judgment that NTTA violated the section.

However, as NTTA maintains, section 366.178(c) does not create a private right of action.  NTTA's MSJ Brief at 23-25; NTTA's Opp. Brief at 24-26.  When the statute is written as an authorization or directive to a governmental agency, courts routinely conclude that it does not create a private right of action.  See, *e.g.*, *Armstrong v. Exceptional Child Center, Inc.*, __ U.S. __, 135 S. Ct. 1378, 1387 (2015); *Alexander v. Sandoval*, 532 U.S. 275, 286-87 (2001); *Witkowski v. Brian Fooshee & Yonge Properties*, 181 S.W.3d 824, 831 (Tex. App.--Austin 2005, no pet.).

"[E]ven if a statute is unenforceable by any public official, attorney, or agency, this alone does not justify an implied cause of action."  *Coll v. Abaco Operating LLC*, No. 2:08-CV-345-TJW, 2011 WL 1831748, at *6 (E.D. Tex. May 12, 2011).  The courts may not "'legislate . . . in order to fill any hiatus' left by the legislature."  *Id.* (quoting *Brown v. De La Cruz*, 156 S.W.3d 560, 566 (Tex. 2004)).  The language of TEX. TRANSP. CODE ANN. § 366.178(c) cannot be read to create a private cause of action.  *Brown*, 156 S.W.3d at 567 (expressly rejecting the rule that a private cause of action may be created by "necessary implication" or where it appears necessary "to effectuate the statutory purposes.").  To the contrary, section 366.178(c) only authorizes agency action to collect administrative fees.  *See* TEX. TRANSP. CODE § 366.178(c)(2).  The provision provides no mechanism for private individuals or the courts to enforce its provisions or to litigate whether there is an adequate correlation between the amount of the fee charged and the costs of collecting unpaid tolls.  *Coll*,

2011 WL 1831748, at *3-7 (finding that the Texas Supreme Court applies a "strict rule of construction" to statutory enforcement schemes and implies a cause of action only when the legislature's intent to create a private cause of action is clearly expressed from the language of the statute).  Accordingly, section 366.178(c) provides no basis for plaintiffs to sue NTTA over the administrative fees that were charged.

Therefore, the court need not determine whether or not section 366.178(c) required NTTA to correlate the administrative fee to the average cost in collecting unpaid as opposed to correlating the fee to its aggregate costs.  The plaintiffs may not use the Declaratory Judgment Act to obtain relief under a statute that they are not otherwise entitled to enforce.  See *Texas Medical Association v. Aetna Life Insurance Company*, 80 F.3d 153, 159 (5th Cir. 1996).  However, even if the court assumes *arguendo* that NTTA violated § 366.178(c) by charging administrative fees twenty-six times the costs it incurred in collecting unpaid tolls, it nevertheless concludes that NTTA did not violate the plaintiffs' substantive due process rights.  Thus, whether NTTA violated § 366.178(c) or not, NTTA did not violate the plaintiffs' substantive due process rights.

D.  <u>Substantive Due Process Claim</u>

1.  *Legal Standard*

The Fourteenth Amendment prohibits states from depriving "any person of life, liberty, or property, without due process of law."  U.S. CONST. amend. XIV.  In

Texas, money is considered property for purposes of the Fourteenth Amendment. *Canal Insurance Company v. Hopkins*, 238 S.W.3d 549, 568 (Tex. App.--Tyler 2007, pet. denied) (citing *Norris v. City of Waco*, 57 Tex. 635, 643 (Tex. 1882)).  As a result, the state cannot deprive people of their money without due process.  See *Woodard v. Andrus*, 419 F.3d 348, 353-54 (5th Cir. 2005).  Plaintiffs can sue under 42 U.S.C. § 1983 for violations of the constitution, including the Fourteenth Amendment, if they can prove that a defendant deprived them of a constitutional right or privilege while acting under color of state law.  *See* 42 U.S.C. § 1983.

The Supreme Court of the United States has recognized that "due process protection in the substantive sense limits what the government may do in both its legislative and its executive capacities." *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (internal citation omitted).  While the central concern of due process is protecting individuals against any type of arbitrary government action, the "criteria to identify what is fatally arbitrary differ depending on whether it is legislation or a specific act of a government officer that is at issue." *Id.*  The Supreme Court held that "only the most egregious official conduct" is so fatally arbitrary that it violates due process.  *Id.* at 846.  While the Supreme Court in *Lewis* endorsed a test that asks whether executive conduct "'shocks the conscience'" and "violates the 'decencies of civilized conduct,'" the situation before it in that case involved a high speed police chase.  *Id.* at 836-37, 846 (quoting *Rochin v. California*, 342 U.S. 165, 172-73

- 24 -

(1952)).  The Supreme Court went on to distinguish between situations that require

fast action on behalf of the executive, like police chases, and those that afford the

executive time for deliberation and forethought.  *Id.* at 850-53.

In cases where a plaintiff alleges a violation of substantive due process by

executive or quasi-legislative action in a situation that affords a government actor

time for deliberation, the government action is subject to a rational basis test.  See

*Vineyard Investments, L.L.C. v. City of Madison, Mississippi*, 440 F. App'x 310, 313-14

(5th Cir. 2011), *cert. denied*, __ U.S. __, 132 S.Ct. 1865 (2012); *Mikeska v. City of

Galveston*, 451 F.3d 376, 379 (5th Cir. 2006); *FM Properties Operating Company v. City

of Austin*, 93 F.3d 167, 174 (5th Cir. 1996).  Under the rational basis test, the

"government action comports with substantive due process if the action is rationally

related to a legitimate government interest."  *FM Properties Operating Company*, 93

F.3d at 174.  The effect of this rational basis review is that substantive due process is

not violated merely because government executive or quasi-legislative action violates a

state statute -- rather, due process is only implicated if the government action was

also not rationally related to a legitimate government interest.  See *id.*  The

determination of whether such government action "has the requisite rational

relationship to a legitimate government interest is a question of law."  *Mikeska*, 451

F.3d at 379 (internal quotation marks omitted).

## 2.  *Rational Basis Standard Applies*

Previously, the court analyzed the plaintiffs' substantive due process claim

under a rational basis test.  *Reyes*, 2014 WL 2616841, at *7-*10.  The court

distinguished, as previous Fifth Circuit courts have as well, cases assessing the

constitutionality of executive conduct in a situation that requires fast action from

cases in which the executive is acting with time for deliberation.  *Id.* at *7.

NTTA contends that the court should analyze NTTA's conduct under the

"shocks the conscience" standard as opposed to the rational basis standard.  *See*

NTTA's MSJ Brief at 26, NTTA's Opp. Brief at 36-37, NTTA's Reply at 3-4.  The

plaintiffs maintain that the proper inquiry is the rational basis test.[11]  *See* Plaintiffs'

Brief in Opposition to NTTA's Motion for Summary Judgment ("Plaintiffs' Opp.

Brief") at 16-19 (docket entry 165); Plaintiffs' Reply in Support of Their Motion for

Partial Summary Judgment and Declaratory Relief ("Plaintiffs' Reply") at 8-9 (docket

entry 171).  According to NTTA, since the court is assessing the constitutionality of

executive action (NTTA setting, charging and imposing its administrative fee), it

---

[11]     To preserve the issue, the plaintiffs also contend that money is a
fundamental right and therefore the proper analysis should be under the strict
scrutiny standard.  Plaintiffs' MPSJ Brief at 17 n.20 (citing *Hearts Bluff Game Ranch,
Inc. v. State*, 381 S.W.3d 468, 476 (Tex. 2012), *cert. denied*, __ U.S. __, 133 S. Ct.
1999 (2013)).  The court notes that the court in *Hearts Bluff Game Ranch, Inc.*, 381
S.W.3d at 476, references private real property rights, and not private personal
property rights like money, which is at issue here.  Further, the plaintiffs cite no case
in which a court has analyzed a government's collection of a fee under a strict
scrutiny standard, and the court declines to do so here.

follows that the proper inquiry is the "shocks the conscience standard" and for the

court to determine whether NTTA's action were so extreme that they "violate[d] the

decencies of civilized conduct."  NTTA's MSJ Brief at 26 (quoting *Lewis*, 523 U.S. at

846-47).  NTTA cites several cases that have applied this standard when a

government actor has time to deliberate.  *Id.*

     In all of the cases NTTA cites, however, the executive actions were directed

towards individual interests.  The cases NTTA cites in support of the shocks the

conscience standard involve the deportation of an individual, *Matto v. Gonzales*, 175

F. App'x 670, 671 (5th Cir. 2006), the award of a contract to a bid higher than the

low bidder, *Nobles Construction, L.L.C. v. Washington Parish*, 544 F. App'x 263, 267-68

(5th Cir. 2013), and a denial of an applicant's water rights.  *Bragg v. Edwards Aquifer

Authority*, 342 F. App'x 43, 45 (5th Cir. 2009).  Courts have applied the rational basis

test when assessing the constitutionality of executive action that is quasi legislative,

meaning that it "applies to a large group of interests."  *Gaalla v. Citizens Medical

Center*, 407 F. App'x 810, 813 (5th Cir.), *cert. denied*, 563 U.S. 990 (2011); see also

*FM Properties Operating Company*, 93 F.3d at 174 (reasoning "when challenges to such

land-use decisions aspire to constitutional stature, we view those decisions as 'quasi-

legislative' in nature, and thus sustainable against a substantive due process challenge

if there exists therefor any conceivable rational basis") (internal quotations omitted);

*Mikeska*, 451 F.3d at 379 (land regulation case analyzed under rational basis test).

While NTTA is correct that some of the plaintiffs' complaints with NTTA's imposition of its administrative fee relate to the way NTTA has applied the fee in practice against specific violators, the crux of their complaint is the quasi-legislative action of setting the administrative fee at $25 and charging $1.38 billion worth of administrative fees despite only incurring roughly $52 million in costs in collecting the underlying unpaid tolls. Fourth Am. Complaint ¶¶ 58-68. Thus, because NTTA's actions were quasi-legislative under Fifth Circuit precedent, they are reviewed under rational basis scrutiny.

### 3. *The Plaintiffs Have Satisfied the Preliminary Requirements*

The plaintiffs moved for summary judgment on the ground that "NTTA's illegal $1.38 billion administrative fee scheme -- where its costs of collecting unpaid tolls were only . . . $52 million -- violates [their] substantive due process" rights. Plaintiffs' MPSJ Brief at 1. The plaintiffs contend that NTTA's conduct is irrational, arbitrary and abusive. *Id.* NTTA has moved for summary judgment on the grounds that it did not violate section 366.178 and that even if it did, a lack of correlation between its administrative fees and costs of collection does not constitute a violation of due process because it had a legitimate government purpose that was rationally related to the $25 per transaction administrative fee. NTTA's MSJ Brief at 23-32.

NTTA's administrative fee scheme would constitute a violation of due process if the fees (1) deprived the plaintiffs of a constitutional right, and (2) were not

rationally related to a legitimate government interest. *FM Properties Operating Company*, 93 F.3d at 174. The first question must be answered in the affirmative, as NTTA deprived plaintiffs of their money, which is considered property for the purposes of the Fourteenth Amendment under Texas law. See *Hopkins*, 238 S.W.3d at 568 (citing *Norris*, 57 Tex. at 643).[12] The court must therefore turn to the second question and determine whether NTTA has established that its administrative fees were rationally related to a legitimate government interest.

As the court has previously stated, a person who, under color of state law, charges fees in excess of those authorized by statute, can be liable for a substantive due process violation. See *Reyes*, 2014 WL 2616841, at *7 (citing, *inter alia*, 42 U.S.C. § 1983). NTTA is a government actor. *See* Plaintiffs' MPSJ App. at 123 (NTTA referring to itself as a governmental entity). Therefore, its actions are subject to scrutiny under § 1983.

### 4. *Legitimate Government Interests*

The plaintiffs bear the burden of proving a substantive due process violation. See *Simi Investment Company, Inc. v. Harris County, Texas*, 236 F.3d 240, 249 (5th Cir. 2000), *cert. denied*, 534 U.S. 1022 (2001). The plaintiffs face a difficult burden here because "substantive due process is not violated merely because government executive or quasi-legislative action violates a state statute" and NTTA's actions must be upheld

---

[12]     *See* Section II.D.1 above.

"if the action is rationally related to a legitimate government interest." *Reyes*, 2014 WL 2616841, at *7 (citing *FM Properties Operating Company*, 93 F.3d at 174).

The court denied NTTA's motion for summary judgment on threshold issues related to the plaintiffs' substantive due process claim, in part because NTTA failed to offer any reasonable purpose for setting its uncorrelated fees. *Reyes*, 2014 WL 2616841, at *10. The court concluded that more factual development was necessary before it could determine whether NTTA's actions were rationally related to a legitimate government interest. *Id.* at *10.

To reiterate the standard, the question in a substantive due process analysis is "only whether a rational relationship exists between the [government's action] and a *conceivable* legitimate governmental objective." *FM Properties Operating Company*, 93 F.3d at 174-75 (emphasis in original) (internal quotations omitted). The legitimate government purposes cited by NTTA need not be the actual or proven purpose -- or purposes -- of the specific government action. *Id.*; *Shelton v. City of College Station*, 780 F.2d 475, 481 (5th Cir.) (en banc), *cert. denied*, 477 U.S. 905 (1986). Supreme Court jurisprudence "[has] not elaborated on the standards for determining what constitutes a legitimate state interest [,] [but has] made clear . . . that a broad range of governmental purposes and regulations satisfies these requirements." *Nollan v. California Coastal Communication*, 483 U.S. 825, 834-35 (1987) (internal quotations omitted). Nonetheless, NTTA offers two legitimate governmental purposes for the

$25 administrative fee it charged and imposing the administrative fee in the fashion it did.  NTTA's legitimate government purposes were (1) "to recover the costs associated with collecting unpaid tolls;" NTTA's MSJ Brief at 28, and (2) "to encourage ZipCash customers to switch to TollTags."  *Id.* at 29.

First, a government has a legitimate interest in charging fees to offset its costs. *Broussard v. Parish of New Orleans*, 318 F.3d 644, 656-57, 660 (5th Cir.), *cert. denied*, 539 U.S. 915 (2003) ("[T]he government has an interest in the extant procedures to hold down costs and fund a sheriff's office's bail-bond system.").  The government like any person has to pay its debts.  *Gibbons v. United States*, 75 U.S. 269, 274 (1868) ("The supposition that the government will not pay its debts . . . is not to be indulged.").  When the government incurs costs, it needs to recover those costs.  If it does not, it may go into bankruptcy.[13]  There is no doubt that a government entity has a legitimate interest in offsetting its costs.  See *General Textile Printing & Processing Corporation v. City of Rocky Mount*, 908 F. Supp. 1295, 1304 (E.D. N.C. 1995) (dismissing the plaintiff's claim for a violation of its substantive due process rights for arbitrarily high rates on the grounds that a city needs to finance its operations and needs to devise a plan to generate revenue sufficient to support its operations).

---

[13]      As an illustration, one toll road in Texas recently filed for Chapter 11 protection in the United States Bankruptcy Court in the Western District of Texas, Austin Division.  *SH 130 Concession Company, LLC*, No. 16-10262-tmd (W.D. Tex. 2016); Tom Corrigan, *Texas Toll-Road Operator Files for Bankruptcy*, WALL ST. J. (Mar. 2, 2016), http://www.wsj.com/articles/texas-toll-road-operator-files-for-bankruptcy-1456958991.

While only one conceivable legitimate government interest is necessary, NTTA's interest in getting ZipCash drivers to set-up a TollTag account is also a legitimate government purpose.  TollTags lower the costs of collecting tolls, NTTA's MSJ App. at 008, and increase the likelihood that tolls will be paid.  *Id.*  Just as a government entity has an interest in offsetting its costs, so also it has an interest in lowering its costs and increasing the likelihood that its accounts receivables pay their debts.  See, *e.g.*, *Broussard*, 318 F.3d at 656-57; *Garrett v. Lyng*, 877 F.2d 472, 476 (6th Cir. 1989) (recognizing reduction of costs as a legitimate government interest); *Boyer v. United States*, 323 F. App'x 917, 921 (Fed. Cir. 2009) (same).  NTTA is a government entity acting in the marketplace.  It is building, maintaining, and tolling roads, tunnels and bridges.  NTTA can act like a business, because it needs to act like a business to function at all.  Therefore, like any good business, NTTA has a legitimate interest in cutting its costs.  *Lyng*, 877 F.2d at 476.

### 5.  *NTTA's Administrative Fees Were Rationally Related to Governmental Interests*

Since the court has determined that NTTA had a legitimate government interest, the only remaining question is whether there is a rational relationship between the $25 administrative fee scheme and NTTA's conceivable legitimate government interest(s).  *FM Properties Operating Company*, 93 F.3d at 174.

In their briefs, the plaintiffs continually conflate section 366.178's requirements with the analysis under the rational basis standard.  *See* Plaintiffs' MPSJ

- 32 -

Brief at 26, 28; Plaintiffs' Opp. Brief at 21 ("NTTA's contention ignores the statute."), 22, 24; Plaintiffs' Reply at 10, 12, 14.  The plaintiffs maintain that NTTA's actions were not rational because they "thwart[] the Texas Legislature's intent;" "[t]he administrative fee was never intended to be used for deterrent or punitive purposes;" and "[t]he power granted to the NTTA to impose an administrative fee was for the singular purpose of recovering the cost of collecting an individual's unpaid toll." *Id.* at 10.  The plaintiffs stubbornly focus on whether NTTA's actions violate 366.178.  The court's analysis of whether NTTA violated the plaintiffs' substantive due process rights is separate and distinct from an analysis regarding whether NTTA violated section 366.178.

State law standards are not relevant to the federal constitutional inquiry.  See *Stern v. Tarrant County Hospital District*, 778 F.2d 1052, 1057 (5th Cir. 1985) (en banc), *cert. denied*, 476 U.S. 1108 (1986).  Therefore, whether NTTA set an administrative fee that was correlated to its costs in collecting the unpaid toll is no longer the relevant question.  So long as NTTA set its administrative fee at an amount that was rationally related to any conceivable legitimate government interest, it did not violate the plaintiffs' substantive due process rights.  The plaintiffs' contention that NTTA cannot use the administrative fee to encourage drivers to obtain a TollTag because that was not the Texas legislature's purpose for the administrative fee lacks any relevance to the court's inquiry in assessing the

constitutionality of a quasi-legislative executive action. *Id.* at 1057. The plaintiffs state that the court ruled that the administrative fee authorized in section 366.178(c) and the fine authorized in section 366.178(b) are distinctly separate to support their argument that NTTA cannot rationally use the administrative fee to encourage or deter payment of tolls. *See* Plaintiffs' Opp. Brief at 26. The plaintiffs, however, lift this sentence out of context. The court properly analyzed the difference between the two statutory provisions in the section of the court's order that set forth the proper statutory construction of section 366.178(c). *Reyes,* 2014 WL 2616841, at *5. The restrictions placed on NTTA by the statute are relevant to determine whether NTTA violated the statute,[14] not whether NTTA violated the plaintiffs' due process rights.

Precedent is clear that the plaintiffs cannot, and the court will not, enforce state law through substantive due process claims. *Gerhart v. Hayes*, 201 F.3d 646, 650 (5th Cir.) ("The fundamental issue in due process law is not whether state officials violated state law, but whether they provided the plaintiff with the [federal] constitutional minima."), *cert. denied*, 531 U.S. 1014 (2000). Section 366.178 "does not define the equality or rationality guaranteed by the fourteenth amendment." *Stern,* 778 F.3d at 1057. The due process clause "does not require a state to implement its own law correctly." *FM Properties Operating Company*, 93 F.3d at 174.

---

[14]     As discussed previously, the statute does not provide the plaintiffs with a right to enforce the terms of the statute through a private cause of action. *See* Section II.C.3 above.

The court will not, as the plaintiffs would have it, "improperly bootstrap[] state law into the Constitution." *Id.* at 174.

Despite mostly arguing that NTTA's actions are irrational and arbitrary in the context of section 366.178, the plaintiffs do contend that NTTA's actions are not rationally related to NTTA's stated legitimate government interests. The plaintiffs maintain that NTTA's administrative fee scheme is not rationally related to its interest in collecting its costs because it imposed $1.38 billion in administrative fees, which is 26 times the cost NTTA incurred in collecting the underlying unpaid tolls. Plaintiffs' MPSJ Brief at 24; Plaintiffs' Reply at 11. The plaintiffs contend that NTTA's waiver of almost $500 million in administrative fees, Plaintiffs' MPSJ Brief at 28, its two-thirds reduction of the $25 administrative fee if the customer paid the underlying unpaid tolls and converted to a TollTag payment system, Plaintiffs' Reply at 11-12, and its failure to collect $472 million in unpaid administrative fees incurred by drivers between 2008 and 2011 amount to an arbitrary system that violated their constitutional rights. *Id.* at 18. The plaintiffs maintain that "a fee of 26 times collection costs fails to have any statistically rational relationship to NTTA's collection goals," thereby violating their due process rights. *Id.* at 12.

"$1.38 billion economic weapon" and "a fee 26 times collection costs" conjure up suspicions of arbitrary government action. *Id.* at 11-12. The labels successfully illustrate the plaintiffs' argument that NTTA violated the statute. TEX. TRANS. CODE

- 35 -

§ 366.178.  Yet, outside the context of the statute, the only fees that NTTA can

balance with its collection costs are the fees it actually collected.  NTTA's costs of

collection exceeded its collected administrative fees by approximately $10 million.

NTTA's MSJ Brief at 18.  While it only cost NTTA roughly one dollar to collect an

average unpaid toll, only 31.7% of unpaid toll transactions that reached the Violation

Invoice stage were ultimately paid, NTTA's Appendix in Support of its Opposition to

Plaintiffs' Motion for Partial Summary Judgment and Declaratory Relief  ("NTTA's

Opp. App.") at 005-06 (docket entry 161), NTTA collected only 2.8% or (1/35) of

the administrative fees invoiced, *id.*, and NTTA collected only 1.8% of the

administrative fees charged at the Violation Invoice stage.  *Id.* at 086.  Analysis of

these percentages demonstrates that NTTA collects less than 1/26 of the

administrative fees charged, *i.e.*, less than the amount it costs NTTA to collect the

underlying unpaid tolls.  *Id.* at 005-06.

Furthermore, the plaintiffs contend, the fact NTTA lowered its administrative

fee from $25 to $8.33, despite the fact it was not collecting more than it cost NTTA

to collect the unpaid tolls, proves NTTA's arbitrariness.  Plaintiffs' Opp. Brief at 10.

Perhaps NTTA made a bad business decision -- maybe it could have reduced the fee

and recovered more tolls and fees in the process.  Yet NTTA conceivably established

this administrative scheme with the goal of collecting enough fees to cover its costs.

*FM Properties Operating Company*, 93 F.3d at 174 ("The power . . . to be wrong as well

as [to be] right on contestable issues, is both [the] privilege and curse of democracy.")

(quoting *National Paint & Coatings Association v. City of Chicago*, 45 F.3d 1124, 1127

(7th Cir.), *cert. denied*, 515 U.S. 1143 (1995)).  NTTA's actions are judged under a

discretionary standard.  See *Exxon Corporation v. Governor of Maryland*, 437 U.S. 117,

124 (1978) (The Fourteenth Amendment "does not empower the judiciary to sit as a

superlegislature to weigh the wisdom" or desirability of government actions.) (internal

quotations omitted).  The $25 administrative fee scheme paralleled other tolling

agencies.  NTTA's MSJ App. at 230, 239, 241, 248, 356-57, 435-37.  NTTA did not

earn excess revenue based on the $25 administrative fee.  *Id.* at 559.  Further, when

setting fees, it is customary and appropriate to set a fee based on the reality that some

people will not pay.  See *Black v. Educational Credit Management Corporation*, 459 F.3d

796, 800 (7th Cir. 2006).  NTTA did not act outside established norms in setting the

$25 administrative fee.

The plaintiffs contest NTTA's justification -- that there will be "leakage" in the

collection of administrative fees -- for setting the administrative fee higher than the

average cost of collection.  Plaintiffs' MPSJ App. at 014-15.  The plaintiffs contend

that NTTA double-counts the leakage premium because NTTA already charges

ZipCash drivers a premium rate to account for the leakage.  *Id.*  Raising a rate or price

to account for leakage is a well-known economic principle.  NTTA's Opp. App. at

002-03.  There is nothing irrational about accounting for leakage risk of collecting

unpaid tolls in the amount of toll and leakage risk of collecting the fees in the amount of the administrative fee.  Since NTTA is not generating enough revenue to cover its costs of collection, it is clear that it is not double-counting the leakage premium but splitting up the leakage problem between two separate sources of income.

Next, the plaintiffs maintain that the $25 administrative fee was arbitrary when it was set because it was adopted without deliberation at a board of directors meeting in 2000.  Plaintiffs' Opp. Brief at 5; Plaintiffs' Opp. App. at 252-53, 354-56; Plaintiffs' Reply at 16.  While the meeting transcript indicates there was no discussion at that particular meeting, it was not NTTA's burden to prove that it had a legitimate government interest in setting the administrative fee.  *Simi Investment Company, Inc.*, 236 F.3d at 249.  The statute authorized NTTA to set an administrative fee at any price up to $100 to collect its costs in collecting the unpaid toll.  *See* § 366.178(c).  NTTA increased the fees to $25 because it created TollTag-Only lanes, which NTTA anticipated would result in more violations and, relatedly, increase costs to pursue collection of those violations.  NTTA's MSJ App. at 232, 661, 670.  NTTA removed gates, installed high speed cameras, and established a new toll collection administration that had previously focused on payments at the tollgates or through TollTag accounts.  NTTA's MSJ App. at 005.  Based on its experience, NTTA implemented a drastic change, and reasonably anticipated increased collection costs due to an increase in drivers who paid by ZipCash.  *See* Plaintiffs' MPSJ App. at

177; Plaintiffs' MPSJ Brief at 12.  Under Fifth Circuit precedent, it is rational for a government entity to rely on its experience.  *FM Properties Operating Company*, 93 F.3d at 175; *United States v. Sperry Corporation*, 493 U.S. 52, 64-66 (1989).

The plaintiffs also contend that NTTA arbitrarily waived administrative fees to get drivers to pay unpaid tolls and to switch to TollTags.  Plaintiffs' Reply at 13.  NTTA's CSC policy strove to collect the unpaid tolls.  NTTA's Opp. App. at 007-08.  NTTA clearly outlined the circumstances in which the CSC agents were permitted to waive administrative fees.  *Id.* at 046-66.  The plaintiffs maintain that NTTA's waiver practice shifted a disproportionate share of collection costs to others.[15]  Plaintiffs' Reply at 14.  Yet most of the named plaintiffs were offered a waiver and benefitted from NTTA's waiver practice.  *See* NTTA's Opp. Brief at 20-23, 32.

Lastly, the plaintiffs maintain there is no rational relationship between NTTA's setting of the administrative fee at such a high level only to waive the fee to encourage some to switch to TollTags.  Plaintiffs' Opp. Brief at 25-28.  There is nothing irrational about giving incentives to a debtor to pay her debts.[16]  Cf. *United*

---

[15]     The plaintiffs do not, however, have an equal protection claim in this case.

[16]     The plaintiffs contend that the only purpose of an administrative fee is to recover costs, differentiating it from a fine or penalty.  Plaintiffs' Opp. Brief at 26 (citing *Weir v. State*, 278 S.W.3d 364, 365-66 (Tex. Crim. App. 2009).  While costs, fines and fees have distinct meanings for purposes of statutory construction, the court is not persuaded by plaintiffs' argument, in a substantive due process inquiry, that an administrative fee cannot cover costs and seek to encourage payment.

*States v. White*, 71 F.3d 920, 924 (D.C. Cir. 1995) (recognizing the rationality of the government's use of a carrot to encourage action); *see also* NTTA's Opp. App. at 008-09.  The plaintiffs here are drivers who used a tollway and were sent a bill.  The plaintiffs failed to pay after one notice, and then failed to pay again after the second notice.  The plaintiffs were then sent a third notice charging them with a $25 or $8.33 administrative fee per unpaid toll.  The plaintiffs complain those who do pay bear a disproportionate burden compared to those who switched to TollTags or who never paid.  Plaintiffs' MPSJ Brief at 27-28.  While it may be a little unfair "as a matter of ultimate morality, . . . the real world does not operate this way.  The price of merchandise in a store reflects the fact that some people shoplift; the rates associated with credit cards reflect the fact that some cardholders never pay their bills." *Black,* 459 F.3d at 800.  NTTA offered each named plaintiff a reduction of the fees and reasonably negotiated in an effort to recover the unpaid tolls.  NTTA's Opp. Brief at 20-23.  To call its actions unconstitutional lifts the $25 administrative fee out of the context of NTTA's operations in the real world.

The plaintiffs have defaulted on their debt and NTTA is trying to collect the underlying debt.  See *United States v. Coastal States Crude Gathering Company*, 643 F.2d 1125, 1128 (5th Cir.), *cert. denied*, 454 U.S. 835 (1981) (denying a due process violation where the government allocated  fees on those who caused the underlying problem).  It is not irrational for a government entity to charge more to account for

leakage and to offer a reduction or waiver of the administrative fee if the driver

switches to a TollTag payment system that reduces NTTA's operational costs.  NTTA

saves money in the long run by reducing its collection costs -- converting a risky

account receivable to a reliable account receivable in a TollTag customer, the

customer does not have to pay the fee or pays a reduced fee, and the customer pays

the underlying unpaid toll for using the toll road.

NTTA's administrative fee (a) encouraged people to switch to TollTags,

(b) deterred people from failing to pay their tolls, (c) left room for NTTA to negotiate

to encourage prompt payment of the tolls, and (d) minimized leakage.  NTTA's Opp.

Brief at 44, 47.  The plaintiffs contend that the $25 administrative fee was excessive,

yet at no point do the plaintiffs offer or propose what fee would not be excessive.

The plaintiffs contend that the damages the plaintiffs have incurred would be the $25

or $8.33 minus the average cost of collection.  *See* Plaintiffs' Opp. App. at 017-019,

029-31.  Nowhere do the plaintiffs explain why the only constitutional action NTTA

could have taken was to set the administrative fee at the average cost of collection.

If the question is at least debatable, there is no substantive due process

violation.  *Village of Euclid, Ohio v. Ambler Realty Co.*, 272 U.S. 365, 388 (1926).

When NTTA previously filed a motion for summary judgment on threshold issues,

the court held that more factual development was necessary before it could decide

whether NTTA's actions were rationally related to a legitimate government interest.

*Reyes*, 2014 WL 2616841, at *10.   NTTA presented evidence of its budgetary

calculations, *see* NTTA's MSJ App. at 031-56, 83; Plaintiffs' MPSJ App. at 107-118,

the amount of administrative fees charged to each person, *see* NTTA's MSJ App. at

084-96, the percentage of people who normally remit payment upon notice of unpaid

tolls (2.8%), NTTA's Opp. App. at 005-06, and the cost of collecting unpaid tolls

($52 million).   NTTA's MSJ App. at 030, 083-84.   Further, NTTA offered

conceivable legitimate government interests that were rationally related to its actions,

thereby distinguishing this case from *Mikeska*, 451 F.3d at 381-82, with which the

court previously compared this case.   *Reyes*, 2014 WL 2616841, at *10.

Now that the facts are more fully developed, this case is more analogous to the

case before the Fifth Circuit in *FM Properties Operating Company*, 93 F.3d at 170-72,

where the city of Austin implemented a policy -- allegedly misinterpreting a Texas

statute -- which harmed the plaintiffs.   The court assumed that the city

misinterpreted the statute, but held that the action was rationally related to a

legitimate government interest.   *Id.* at 174-75.   Also, this case is unlike *Simi Investment*

*Company, Inc.*, 236 F.3d at 254, where the Fifth Circuit concluded that the plaintiffs'

substantive due process rights were violated where the government "acted without a

rational basis" in using a "ridiculously narrow" fake five-foot park to interfere with

private property interests to intentionally benefit a non-government third party

entity.  In contrast, NTTA acted rationally to advance its legitimate government interests of cost collection and cost reduction by collecting unpaid tolls.

Additionally, the plaintiffs' reliance on several cases for the proposition that NTTA's administrative fee scheme violated their substantive due process rights is misplaced.  The fee at issue in *Hale v. Morgan*, 22 Cal. 3d 388, 399-400 (1978), was mandatory, daily, limitless and based on a single violation.  Here, the Texas legislature permitted NTTA to impose a discretionary administrative fee, giving it the option to waive it under circumstances like the payment of underlying tolls, or if the initial notice went to an old address.  Further, *Hale*, 22 Cal. 3d at 399-400, is a state supreme court case from the 1970s that is not binding on this court.

The plaintiffs' reliance on the United State Supreme Court's decision in *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 562 (1996), and *State Farm Mutual Automobile Insurance Company v. Campbell*, 538 U.S. 408, 416-17 (2003), is also inappropriate.  *See* Plaintiffs' MPSJ Brief at 23.  Both decisions relate to constitutional challenges to punitive damage awards imposed at the conclusion of civil litigation.  *Id.*  The cases do not address a challenge to a compensatory governmental fee, nor do the plaintiffs explain why they should be relevant to this dispute.  Further, the plaintiffs do not adequately distinguish this case from the numerous cases denying a substantive due process claim for onerous fees or economic regulation.  See, *e.g.*, *Hispanic Taco Vendors of Washington v. City of Pasco*, 790 F. Supp.

1023, 1028 (E.D. Wash. 1991) ("[I]n the local economic sphere, it is only . . . the wholly arbitrary act . . . which cannot stand consistently with the Fourteenth Amendment. . . .  Thus, it is not for this [c]ourt to determine whether the [authority] acted wisely . . . or whether it could have accomplished its goals more effectively by some other means.") (internal citations omitted), *aff'd*, 994 F.2d 676 (9th Cir. 1993); *HVR, Inc. v. City of Newport, Rhode Island*, 145 F. Supp. 2d 177, 181-82 (D.R.I. 2001) (litter fee imposed on restaurants); *Nextel Communications of the Mid-Atlantic, Inc. v. Town of Randolph, Massachusetts*, 193 F. Supp. 2d 311, 320-22 (D. Mass. 2002) (filing and review fees for cell tower that violated state law).

Rational basis review under the Fourteenth Amendment does not authorize the federal judiciary to sit as a superlegislature to judge the wisdom or desirability of state action. *Exxon Corporation*, 437 U.S. at 124.  NTTA's administrative fee scheme burdened negligent drivers, who failed or refused to pay the fees within the invoiced deadlines, with (sometimes expensive) charges.  This scheme may not have complied with the Texas statute and may not have been the best or wisest business policy.  The statistics in the record expose NTTA as a bad debt collector.  *See* NTTA's Opp. App. 005-06.  Yet NTTA's administrative fee scheme does not violate the plaintiffs' substantive due process rights.  *Nextel Communications of the Mid-Atlantic, Inc.*, 193 F. Supp. 2d at 322 ("[T]he mere fact that [a government agency] may have violated or abused . . . state regulatory regimes by imposing . . . an application fee in excess of

regulatory limits, has no direct bearing on whether [the agency] violated [the plaintiffs'] equal protection rights.") (internal quotations omitted).

The Supreme Court has "made it clear that the due process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm." *Lewis*, 523 U.S. at 848. NTTA charged plaintiffs a late fee per each unpaid toll that did not correspond to NTTA's average collection cost per unpaid toll. The plaintiffs failed, or refused, to pay their unpaid tolls within a reasonable time after receiving two prior notices with conspicuous warnings on the consequences for failing to pay. The plaintiffs did not heed those warnings, and their debt increased. Now, the plaintiffs seek a refund or an injunction because the costs of their failure to act does not equal NTTA's collection costs. The due process clause of the Fourteenth Amendment does not provide the plaintiffs the redress they seek.

NTTA has a legitimate government interest in recouping its collection costs and in switching drivers to TollTag accounts, and its decision to assess a $25 (and later an $8.33) administrative fee, while not necessarily politic or a proper interpretation of the statute, was rationally related to those interests. The record as a whole could not lead a rational fact finder to enter a verdict for the plaintiffs because there is no genuine dispute that NTTA's actions did not violate the plaintiffs' substantive due process rights. See *Zenith Radio Corporation*, 475 U.S. at 587. There

is no genuine dispute as to any material fact, and NTTA is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a).

### E.  The Plaintiffs' Remaining Claims Fail As a Matter of Law

Since the plaintiffs' substantive due process rights claim fails as a matter of law and section 366.178 does not provide plaintiffs with a private right of action, the plaintiffs' remaining declaratory judgment and injunctive relief claims fail as a matter of law.  *Crook v. Galaviz*, 616 F. App'x 747, 753 (5th Cir. 2015), *cert. denied*, __ U.S. __, 136 S. Ct. 865 (2016) ("As an injunction is a remedy that must be supported by an underlying cause of action, the failure of [her] constitutional and common law claims also warrants dismissal of this claim."); *Dallas County, Texas v. MERSCORP, Inc.*, 2 F. Supp. 3d 938, 947 (N.D. Tex. 2014) (O'Connor, J.), *aff'd sub nom. Harris County Texas v. MERSCORP Inc.*, 791 F.3d 545 (5th Cir. 2015) (same with regard to a declaratory judgment claim).

### III.  CONCLUSION

For the reasons stated above, the plaintiffs' motion for partial summary judgment is **DENIED**, and the defendant's motion for summary judgment is **GRANTED**.  Judgment will be entered for the defendants.

**SO ORDERED**.

May 16, 2016.

_____
A. JOE FISH
**Senior United States District Judge**

- 46 -